**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

MAR 28 2018

JAMES W. McCORMACK, CLERK

By: _____

DEP CLERK

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS

Progressive Pipeline Construction, LLC, a
Delaware limited liability company,

                                  Plaintiff,

vs.

Berkley National Insurance Company, an
Iowa corporation,

                                  Defendant.

Court File No. 4:18cv220-JM

This case assigned to District Judge Moody
and to Magistrate Judge Harris

## COMPLAINT
## JURY TRIAL DEMANDED

Plaintiff Progressive Pipeline Construction, LLC ("Progressive Pipeline") for its Complaint for Declaratory Relief against Defendants Berkley National Insurance Company ("Berkley") states and alleges as follows:

### NATURE OF ACTION

1.     This is an action for declaratory relief pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. §2201, *et seq.* An actual and justiciable controversy between the parties exists in this action concerning whether Berkley has a duty to defend and indemnify and provide insurance coverage to Progressive Pipeline as an additional insured under an Energy Commercial General Liability policy issued by Berkley.

## PARTIES

2.　　Progressive Pipeline Construction, LLC, is a Delaware limited liability company with its principal place of business located at 12340 Quitman-Meridian Highway, Meridian, Mississippi 39301. Progressive Pipeline Construction, LLC, is owned by a subsidiary Limited Liability Company, Progressive Pipeline Holdings, LLC, whose majority owning managing member resides in Walton County, Florida. Progressive Pipeline is engaged in the construction industry providing pipeline labor and materials on construction projects.

3.　　Berkley National Insurance Company is an Iowa corporation, with its principal place of business located at 222 Las Colinas Blvd., Suite 1300, Irving, Texas, 75039. Berkley is admitted and provides commercial general liability policies to contractors for construction projects throughout the United States, including the State of Arkansas.

## JURISDICTION AND VENUE

4.　　This Court has subject matter jurisdiction under 28 U.S.C. §1332 (a)(1) because this is a dispute between citizens of different states, involving a matter in controversy that exceeds the value of $75,000, exclusive of costs and interest.

5.　　This Court has personal jurisdiction over Berkley under Ark. Code Ann.§ 16-4-101 for two reasons: 1) Berkley has extensive contacts with Arkansas, including the specific dispute in this action, and 2) the insurance policy includes a national territory-of-coverage clause which subjects Berkley to jurisdiction in Arkansas.

**6.**     Venue is appropriate under 28 U.S.C. §1391(b)(2) because a substantial part of the events giving rise to the claims at issue occurred in this District.

## FACTS

**Construction Services Agreement between Progressive Pipeline and Milbar**

**7.**     On or about February 18, 2014, Progressive Pipeline entered into a Construction Services Agreement (the "Agreement"), as the Contractor, with Milbar Hydro-Test, Inc., ("Milbar") as the Subcontractor.   A true and correct copy of the Agreement is attached as Exhibit A. Under the terms of the Agreement, Milbar agreed to provide services and materials contained in ongoing work orders in exchange for the agreed upon compensation by Progressive Pipeline.

**8.**     Section **8** of the Agreement entitled **Indemnities** states:

    **8.2**     Subcontractor Group means Subcontractor, its employees, and subcontractors of all tiers.   Contractor Group means Contractor, its employees, and subcontractors of all tiers.

    **8.3**     Subcontractor agrees to indemnify, defend, and hold harmless Contractor Group and Owner from all third-party claims of any sort arising out of or relating to the Agreement, caused in any part by Subcontractor Group, and all costs of any sort the Contractor incurs if Subcontractor does not…

**9.**     Section 9 of the Agreement entitled **Insurance** states, in part:

    Subcontractor will maintain Insurance acceptable to Contractor, as follows. Except for Workers Compensation Insurance, all policies must name Contractor as an additional insured, and waive all subrogation rights…

    Section **9.10** states:

    Subcontractor will insure its indemnity duties, with *primary* coverage for Contractor, for at least $2,000,000 per occurrence. The limits and

coverage of this insurance do not limit the indemnity duties in this Agreement, and are independent of them. (emphasis added)

10.     Pursuant to the Agreement with Milbar, on May 15, 2017 Progressive Pipeline issued a work order to Milbar to provide three thirty-six inch (36") test headers, or pipes, for delivery to Progressive Pipeline's construction job site in Searcy, Arkansas ("Work Order"). On May 23, 2017 John Badger of JCB transported the three large pipes from Milbar in Shreveport, Louisiana to Plaintiff's job site at 200 Eastline Road, Searcy, Arkansas ("Job Site"). Mr. Badger was injured while delivering the Milbar pipes to the Job Site.

**Underlying Action**

11.     On June 20, 2017, John Badger and Melissa Badger commenced a lawsuit against Progressive Pipeline in the Circuit Court of White County, Arkansas, Court File No. 73CV-17-292 (the "Underlying Action"). In the Underlying Action the Badgers allege that the injury suffered by John Badger, and the alleged damages, arose from negligence of Progressive Pipeline at the Job Site while John Badger was unloading the Pipes.

12.     On September 12, 2017, the Badgers filed an Amended Complaint in the Underlying Action and named Milbar as a defendant. In the Amended Complaint the Badgers assert the injury suffered by John Badger, and the alleged damages, arose from negligence of Milbar in failing to properly load the Pipes onto John Badger's truck that he used to deliver the Pipes to the Job Site. A true and correct copy of the Amended Complaint is attached as Exhibit B.

**13.**     In the Underlying Action the Badgers seek to recover over $75,000 in damages from Milbar and Progressive Pipeline as joint tortfeasors.

**Insurance Policy**

**14.**     Before commencing its work on the Work Order Milbar purchased and maintained an Energy Commercial General Liability Policy of insurance through Berkley, policy number EGL000449714, with the policy period 03/31/2017 to 03/31/2018   (the "Policy"). Milbar is a named insured under the Policy.

**15.**     As required by the Construction Services Agreement, the Policy provides primary coverage to Progressive Pipeline as an additional insured under the Policy.  The Policy contains an endorsement ADDITIONAL INSURED-DESIGNATED PERSON OR ORGANIZATION, which provides coverage as an additional insured to any person or organization as required by contract. The Policy was in place before Milbar commenced work on the Work Order and the injuries to the Badgers occurred during the policy period.

**16.**     The Underlying Action by the Badgers is a third-party claim arising out of or relating to the Agreement and Work Order.  The Amended Complaint alleges that Mr. Badger's bodily injuries were caused in whole or in part by the negligence, acts or omissions of Milbar and Progressive Pipeline.

**17.**     Given the forgoing, on September 11, 2017, Progressive Pipeline tendered its defense of the Underlying Action to Berkley as an additional insured under the Policy Berkley issued to Milbar.

**18.**     Despite its obligations to cover Progressive Pipeline as an additional insured under the Policy, on November 27, 2017, Berkley denied coverage and has failed and

continues to refuse to provide a defense, indemnity, or coverage to Progressive Pipeline in the Underlying Action.

19.     Because of Berkley's failure and refusal to defend, indemnify, or cover Progressive Pipeline in the Underlying Action, Progressive Pipeline has suffered and continues to suffer damages, including defense costs, which Berkley is obligated to cover under the Policy.

20.     The claims alleged against Progressive Pipeline in the Underlying Action and Progressive Pipeline's legal fees that are covered by the Policy, which Berkley has refused to pay, provide for, or insure, exceed $75,000.

## COUNT I
## DECLARATORY RELIEF

21.     Progressive Pipeline restates each of the foregoing allegations contained herein.

22.     Under 28 U.S.C. § 2201, this action presents an actual case or controversy in this Court's jurisdiction requiring a declaration of the parties' rights and obligations, namely, whether Progressive Pipeline is entitled to a defense, indemnity, and insurance coverage under the Policy for the claims asserted against Progressive Pipeline in the Underlying Action.

23.     Berkley has the burden of proving that there is no coverage for any part of the allegations in the Amended Complaint in the Underlying Action, and Berkley cannot meet this burden.

**24.**     Progressive Pipeline is entitled to a judgment declaring Berkley has a duty to provide a defense, indemnity, and insurance coverage to Progressive Pipeline for claims asserted in the Underlying Action, under the terms of the Policy.

## COUNT II
## BREACH OF CONTRACT

**25.**     Progressive Pipeline restates each of the foregoing allegations contained herein.

**26.**     An enforceable contract for insurance exists between Progressive Pipeline and Berkley for Berkley to provide coverage to Progressive Pipeline as an additional insured.

**27.**     Berkley is contractually obligated to provide a defense, indemnity, and insurance coverage to Plaintiff for the claims asserted in the Underlying Action.

**28.**     Berkley has breached the insurance contract by failing to provide a defense, indemnity, or insurance coverage to Plaintiff for claims asserted in the Underlying Action.

**29.**     Progressive Pipeline is entitled to a judgment against Berkley for all damages caused by Berkley's breach, including without limitation a judgment for the attorney's fees and litigation costs that Progressive Pipeline has incurred and continues to incur in the Underlying Action, in an amount over $75,000.

## COUNT III
## BREACH OF CONTRACT—THIRD-PARTY BENEFICIARY

**30.**     Progressive Pipelines restates each of the foregoing allegations contained herein.

**31.** Progressive Pipeline is an intended third-party beneficiary under the Policy issued by Berkley and is entitled to a defense, indemnity, and insurance coverage under the Policy for the claims asserted in the Underlying Action.

**32.** Berkley has breached its obligations to Progressive Pipeline by refusing or failing to provide a defense, indemnity or insurance coverage to Progressive Pipeline for claims asserted in the Underlying Action.

**33.** Progressive Pipeline is entitled to a judgment against Berkley for all damages caused by Berkley's breach, including without limitation a judgment for the attorneys' fees and litigation costs Progressive Pipeline has incurred and continues to incur in the Underlying Action, in amount over $75,000.

### COUNT IV
### ATTORNEY'S FEES

**34.** Progressive Pipeline restates each of the foregoing allegations contained herein.

**35.** By virtue of the allegations in the Amended Complaint in the Underlying Action, Berkley has a duty to defend Progressive Pipeline under the Policy.

**36.** Berkley has breached its duty to Progressive Pipeline.

**37.** Because Berkley has breached its duty to defend under the Policy, Progressive Pipeline is entitled to recover its attorney's fees and costs in prosecuting this action, pursuant to Ark. Code Ann. § 23-79-209.

38.     Pursuant to Ark Code Ann. § 23-79-208 Progressive Pipeline is entitled to 12% damages upon the amount of the loss for the failure to pay the losses and provide coverage within the time specified in the policy.

**WHEREFORE**, Plaintiff Progressive Pipeline Construction, LLC asks this Court to enter judgment in its favor:

1.     Declaring and adjudging Defendant Berkley National Insurance Company must defend, indemnify, and provide insurance coverage to Plaintiff for the claims asserted in the Underlying Action;

2.     Awarding Plaintiff all damages suffered by Defendant's breach of its duties to Plaintiff under the Policy; and

3.     Awarding Plaintiff 12% damages upon the amount of the loss, together with such further relief as the Court deems just and proper.

### JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted,

**BLAIR & STROUD**

Michelle C. Huff (# 93105)
500 East Main, Suite 201
Batesville, AR 72503
(870) 793-8350
mch@blastlaw.com

***Attorney for Plaintiff***

# Exhibit A

01-11-14 Ver.

# CONSTRUCTION SERVICES AGREEMENT

**PROGRESSIVE PIPELINE CONSTRUCTION, LLC ("Contractor") agrees to buy construction services from**
<u>Milbar Hydro-Test, Inc.</u> ("Subcontractor").

1. **The Work:** Subcontractor agrees to provide the services and materials described as the "Work" in Exhibit A, the "Work Order," consistent with this Agreement. Subcontractor must study the Contract Documents identified in Contractor's agreement with the Owner (Main Contract). Subcontractor must follow the Contract Documents, and include work inferable from them, for the Work. The Contract Documents contain terms that bind the Contractor, and those commercial and technical terms flow down to Subcontractor.

2. **Payment:** Contractor will pay Subcontractor the Subcontract Price, which includes all costs for the Work and compliance with this Agreement, including any taxes. Contractor must preapprove Subcontractor's invoices, and issue a PO number before paying the first invoice. The invoice must include back-up documents proving the amount billed is due, and Contractor may reject any unsupported invoice.

    2.1 Except for ten percent retainage, paid at the end of the job, Contractor will pay Subcontractor for its satisfactory and timely Work using the approved schedule of values. Less retainage, Contractor will pay Subcontractor for satisfactory Work net thirty days after receiving an approved invoice. If Owner has not paid Contractor in thirty days, Contractor will pay Subcontractor seven days after Owner pays.

    2.2 As an absolute condition precedent to payment, Contractor must receive payment from the Owner before paying Subcontractor. Even if it causes a forfeit to Subcontractor, Contractor may never owe more than the Owner pays for the Work.

    2.3 Contractor may reject a Subcontractor payment application, nullify a previously approved payment application, or back charge Subcontractor to protect Contractor from loss or damage caused by Subcontractor.

    2.4 Final payment waives all of Subcontractor's claims, but Contractor keeps its rights to enforce warranties and to require Subcontractor to fix nonconforming Work discovered later.

    2.5 Subcontractor must submit invoicing in a timely manner and will forfeit any unbilled amount if the material or service is not invoiced within sixty days from delivery of said material or completion of non-invoiced work and shall be deemed to be performed by Subcontractor without compensation.

3. **Extras:**

    3.1 If Contractor changes the Work or this Agreement, Contractor will give Subcontractor a change order notice explaining changes to the Work and the schedule. Prior to performing any extra Work, Subcontractor must give Contractor a written proposal for the change. Contractor will accept or negotiate the proposal, and confirm agreement in a written Change Order, which Subcontractor will perform under the terms of this Agreement. Without a signed Change Order, the Work remains unchanged.

    3.2 Subcontractor must give Contractor written notice of all claims for extra compensation. If Subcontractor does not have Contractor's written approval prior to performance, Subcontractor forfeits the claim.

4. **Schedule:** Time is of the essence for both parties. Subcontractor must perform the Work by the approved schedule, and any non-approved delay in the schedule is a material breach of the Agreement.

    4.1 If Owner or Contractor delays Subcontractor's Work, Subcontractor shall notify the Contractor immediately and supply the details of such delay and an updated schedule for correction in writing to the Contractor within 48 hours of delay.  Subcontractor can only claim critical path delays. If Owner pays Contractor for delay or disruption, Contractor will pay the proportional amount owed to the Subcontractor for an approved delay, if any.  Contractor can delay, suspend, or reschedule Subcontractor's Work by extending Subcontractor's schedule as needed.  An extension of time granted to Subcontractor is its exclusive remedy.  Foreseeable delays to the Subcontractor by the Contractor will be coordinated by the Project Manager and assistance may be provided as warranted by the Main Contract.

    4.2 If the Main Contract allows Owner to assess delay damages, liquidated or actual, Contractor may assess those damages against Subcontractor in proportion to Subcontractor's responsibility for delay.

    4.3 Equipment breakdowns or malfunctions are a safety concern and need to be addressed properly; however, breakdowns and malfunctions of Subcontractor's equipment are not reimbursable by Contractor or Owner.  Schedule delays due to breakdowns or malfunction are subject to damages.

5. **Force Majeure:** These delays are noncompensable, but Contractor will grant Subcontractor a time extension for them. They include declarations of Force Majeure by Owner under the Main Contract, Acts of God, sovereign acts, insurrections, epidemics, natural disasters, and other actions not reasonably within Subcontractor's control and that Subcontractor could not have avoided with diligence. Subcontractor must notify Contractor of a Force Majeure event and its probable duration.

6. **Payment of Bills:** Subcontractor must pay all bills for labor or material promptly, and will prove the payments to Contractor if it asks for proof. Subcontractor agrees to keep the Owner's property free from liens caused by nonpayment. Subcontractor will provide lien releases, and collect them from its payees, if Contractor asks for them.

7. **Warranty:**

    7.1 Subcontractor warrants that it is licensed and can do the Work legally. Subcontractor must do the Work safely, in a workmanlike manner, with satisfactory and well-maintained equipment, and with trained, supervised, and efficient personnel.

    7.2 Subcontractor will repair or replace any defective or nonconforming Work at its cost.  This warranty runs for twelve (12) months after Contractor completes the project.  Subcontractor will extend its warranty for one year for repaired or replaced Work. Subcontractor will assign to Contractor all warranties Subcontractor receives from suppliers.  Upon notification, Subcontractor

01-11-14 Ver.

must respond within 48 hours with a mitigation plan acceptable to the Contractor and/or Client. If Subcontractor does not promptly and effectively honor its warranty, Contractor will do, or buy, the work and charge Subcontractor for it. The costs may include overhead, profit, professional fees, costs and expenses, and may be deducted from payments owed to Subcontractor.

7.3   Subcontractor will transfer title to Contractor for all goods and materials that Subcontractor supplies when Subcontractor incorporates them into the Work and is paid for them.

8.   Indemnities:

8.2   Subcontractor Group means Subcontractor, its employees, and subcontractors of all tiers. Contractor Group means Contractor, its employees, and subcontractors of all tiers.

8.3   Subcontractor agrees to indemnify, defend, and hold harmless Contractor Group and Owner from all third-party claims of any sort arising out of or relating to the Agreement, caused in any part by Subcontractor Group, and all costs of any sort the Contractor incurs if Subcontractor does not. Contractor Group makes the same indemnity to Subcontractor Group.

9.   Insurance: Subcontractor will maintain insurance acceptable to Contractor, as follows. Except for Worker's Compensation insurance, all policies must name Contractor as an additional insured, and waive all subrogation rights.

9.1   Worker's Compensation & Employers' Liability:
   9.1.1   Provide statutory workers' compensation insurance wherever Work is done.
   9.1.2   Employers' Liability. Limit: $1,000,000 each accident / $1,000,000 each person
9.2   Commercial General Liability: Standard Commercial General Liability conditions
   9.2.1   Limit:  $1,000,000 each occurrence / $2,000,000 general aggregate
9.3   Automobile Liability:
   9.3.1   Coverage to include all owned, non-owned and hired Automobiles.
   9.3.2   Minimum Coverage Limits: Combined single limit $1,000,000 each accident
9.4   Property: Coverage for any property belonging to Contractor Group and leased or loaned to Subcontractor, is limited to the property's fair market value, plus loss of revenue, taxes, and the costs of necessary transport.
9.5   Professional Liability: If the Work includes professional services, then Subcontractor shall provide insurance covering errors and omissions for bodily injury and property damage arising from the Work. Minimum Coverage Limits: $1,000,000 each occurrence / $2,000,000 aggregate.
9.6   Pollution: Subcontractor must insure against any loss, claim, damage or suit resulting from any pollution or contamination, in any form, resulting from leaks, spills, drilling fluids, testing, dumping, or wastes as related to the Subcontractor's Work, Equipment, items, transport, or operations, regardless of conditions or negligence.
9.7   Marine/Watercraft: If Subcontractor uses marine vessels in the Work, Subcontractor must provide: (i) Hull and Machinery (including Collision Liability) insurance for the market value of the watercraft; (ii) Protection and Indemnity insurance, including pollution liability and removal of wreck for the market value of the watercraft at $1,000,000.00, whichever is greater; (iii) Charterer's Legal Liability coverage; (iv) if the watercraft is for towing, tower's insurance, covering owned, non-owned, and hired watercraft; and (v) Jones Act coverage and coverage for the crew. If Subcontractor is not the owner of the marine vessels, Subcontractor may cause the owner to maintain the required insurance.
9.8   Rigging Insurance - In addition to the other coverages required by this Section, Subcontractor, if Subcontractor performs rigging with its own personnel and equipment, or if Subcontractor subcontracts such work in which case the Subcontractor shall require any subcontractor who supplies any cranes or crane work to procure at such subcontractor's own expense, General Liability Insurance in amounts of not less than $5 million.  Such insurance shall include boom and mast coverage under a Contractors' Equipment Floater.
9.9   Umbrella Insurance: Subcontractor must have and maintain a minimum of $5,000,000 of Umbrella or Excess insurance and must be written in a "following form" basis and shall provide coverage in excess of the coverage required to be provided by the Subcontractor for Commercial General Liability, Automobile Liability, Property, Professional Liability, Pollution, Marine/Watercraft, Rigging, or any other insurance that may be required or utilized as a result of this Agreement or associated Work Orders.
9.10  Insured Contracts: Subcontractor will insure its indemnity duties, with primary coverage for Contractor, for at least $2,000,000 per occurrence. The limits and coverage of this insurance do not limit the indemnity duties in this Agreement, and are independent of them.

10.   Termination; Contractor's Right to Perform Subcontractor's Work:

10.1  Contractor will notify Subcontractor in writing of any breach of the Agreement. If Subcontractor fails to cure a breach of the Agreement or to pursue satisfactory correction of a breach within two working days after Contractor's notice, then Contractor may order Subcontractor to, or may itself, act as needed to cure the breach in Subcontractor's behalf. Subcontractor bears all its costs of cure and will repay all Contractor's costs of cure, including reasonable overhead, profit, and professionals' fees. In an emergency, Contractor may cure without notice; Subcontractor's repayment duty is unchanged.

10.2  If Subcontractor does not cure or pursue satisfactory correction of a breach within two working days of written notice, then Contractor may terminate Subcontractor's right to complete the Work. Contractor may finish the Work in Subcontractor's behalf. Subcontractor will repay all Contractor's costs of completion, including reasonable overhead, profit, and professionals' fees, which Contractor can charge against any unpaid subcontract balance or receive from Subcontractor, if they exceed the balance. Subcontractor may not receive overhead or profit on any uncompleted work.

10.3  If Owner terminates the Main Contract, or a part including the Work, Contractor will notify Subcontractor at once. Subcontractor must immediately stop the Work, follow all of Contractor's instructions, and mitigate termination costs. Contractor agrees to cooperate or pass through any reasonable Subcontractor claim arising out of Owner's termination, with repayment of Contractor's expenses. In any event, Contractor will never owe Subcontractor more than Contractor receives from Owner for the Work.

01-13-14 Ver.

10.4  Contractor can terminate this Agreement for convenience with thirty days' written notice. Subcontractor may not receive overhead or profit on any uncompleted work.

11. **Assignment:** Subcontractor will not assign this Agreement without Contractor's consent. If the Owner terminates the Main Contract, Subcontractor will assign the Agreement if the Main Contract requires it.

12. **Waiver:** Any waiver under this Agreement must be written, knowing, and voluntary. Any claimed waiver does not extend to future conduct not covered by a valid waiver.

13. **Independent Subcontractor:** Subcontractor is an independent subcontractor, with the duty to control its Work. Contractor has hired Subcontractor to get the result of its Work.

14. **Applicable Law:** Mississippi law applies to all aspects of this Agreement, disregarding all conflicts of laws principles.

15. **Entire Agreement:** This Agreement supersedes all other negotiations between the Parties about the Work, and rejects any Subcontractor proposal. It can only change in a writing signed by the Parties.

16. **Third Parties:** The Parties do not intend for this Agreement to confer any benefit on any third party.

17. **Consequential Damages:** Each Party waives any claims for consequential, incidental, indirect, or punitive damages of any kind, and using any legal theory, arising out of or relating to this Agreement.

18. **Safety Requirements:** As part of the Work, Subcontractor must complete all Safety Orientations, Safety Testing (Drug Alcohol, or other), and Safety Training required by Contractor. Subcontractor must supply all safety equipment Contractor requires for the Work. The Subcontractor must provide the following items for every day, crew change, or significant changing event: Gas Monitoring, Safety Meetings, Jobsite Safety Analysis, Equipment Safety Checklists, Vehicle Safety Checklists, Excavation Safety Checklists. Subcontractor must provide these documents daily to Contractor's Project Safety Leader. Each jobsite location must be drug, alcohol, and weapon-free. Subcontractor agrees to remove any worker Contractor finds unsatisfactory or noncompliant. Subcontractor will provide dedicated safety personnel and enforce Safety Policies, as required by and with qualifications satisfying Contractor.

19. **Audit:**   Subcontractor agrees to keep all paper and electronic invoices, supporting documents, and DOT or OSHA records for the Work for three years after its completion. Subcontractor will allow Contractor to copy and access the records at reasonable times, and will cooperate to resolve any adverse audit findings. Contractor can use its own or contract auditors, and Subcontractor will also comply with audit requirements in the Main Contract. Any Party owing money after the audit will pay it in thirty days.

20. **Confidentiality:**   Subcontractor Group agrees to keep all information related to this Agreement confidential, and to use it only for the Work. Subcontractor Group will get Contractor's approval of publicity releases about, or photographs of, the Work. Subcontractor will require each member of Subcontractor Group to comply. The terms of this paragraph last for five years after the Work is complete. On request, Subcontractor will return all confidential information to Contractor or destroy it.

21. **Arbitration:** The Parties recognize that this Agreement involves interstate commerce. They agree to arbitrate all claims or disputes arising out of or related to this Agreement or the Work. The arbitrator alone has the jurisdiction to decide arbitrability of any such claim. A single arbitrator will decide the case, using the Construction Industry Rules of the AAA, and sitting in Meridian, Mississippi. The arbitrator's decision will be enforceable in any court of competent jurisdiction, and the Parties waive their appeal rights. Except for ordering an exchange of trial exhibits, the arbitrator has no authority to order any discovery not agreed to by both parties. The arbitrator must award the prevailing party its professionals' fees, costs, and expenses.

22. **Severability:** Any unenforceable provision is hereby amended by operation of law. Invalidity of one provision does not affect others, which remain in force.

23. **Work Continuation and Payment:** Subcontractor will continue the Work during any dispute resolution proceedings, and Contractor will pay Subcontractor according to this Agreement.

24. **Duration of Agreement:** This Agreement remains effective until the parties perform all duties under it.

25. **Joint Drafting:** Both parties had opportunity to negotiate terms and to seek counsel prior to signature; no rule of interpretation should favor either party.

PROGRESSIVE PIPELINE CONSTRUCTION, LLC

BY:  _Jerri Gardner_

NAME:  Jerri Gardner

TITLE:  Contract Administrator

DATE:  02/18/2014

SUBCONTRACTOR:  Milbar Hydro-Test, Inc.

BY:  _Robert Jackson_

NAME:  Robert Jackson

TITLE:  Administrator

DATE:  02/18/2014

# Exhibit B

IN THE CIRCUIT COURT OF WHITE COUNTY, ARKANSAS
CIVIL DIVISION

JOHN BADGER AND MELISSA BADGER                                      PLAINTIFF

V.                          CASE NO. 73CV-17-292

PROGRESSIVE PIPELINE CONSTRUCTION, LLC
AND MILBAR HYDRO-TEST, INC.                                         DEFENDANTS

## FIRST AMENDED COMPLAINT

COMES now Plaintiffs, John Badger and Melissa Badger, by and through their attorneys, Charles Darwin "Skip" Davidson, Sydney L. Brown, and the Davidson Law Firm, and for their First Amended Complaint against Defendant, Progressive Pipeline Construction, LLC, and Milbar Hydro-Test, Inc., state:

### PARTIES, JURISDICTION, AND VENUE

1.      Plaintiffs John Badger and Melissa Badger are individual persons, citizens and residents of White County, Arkansas.   Plaintiffs John Badger and Melissa Badger are husband and wife.

2.      Defendant Progressive Pipeline Construction, LLC's ("Progressive") principal place of business is located at 12340 Quitman-Meridian Highway, Meridian, Mississippi, 39301, but may be served through its registered agent in the state of Arkansas through The Corporation Company at 124 West Capitol Avenue, Suite 1900, Little Rock, Arkansas 72201. Progressive is a foreign company qualified to do business in Arkansas. Progressive is actually doing business in White County Arkansas and has an office in White County, Arkansas. Progressive is doing construction work in White County Arkansas. Progressive ordered pipes from Milbar Hydro-Test, Inc., which were transported by Plaintiff John Badger to Progressive in White County, Arkansas.

---

3.      Defendant Milbar Hydro-Test, Inc.'s ("Milbar") principal place of business is located at 651 Aero Drive, Shreveport, Louisiana, 71107, but may be served through its registered agent in the state of Arkansas through The Corporation Company at 124 West Capitol Avenue, Suite 1900, Little Rock, Arkansas, 72201. Milbar is a foreign company qualified to do business in Arkansas. Milbar is actually doing business in White County, Arkansas. Milbar does business with Progressive in White County, Arkansas, and Milbar shipped pipes and other products to White County, Arkansas.

4.      The subject matter of this action concerns a tortious injury to Plaintiffs occurring in White County, Arkansas.

5.      Pursuant to Ark. Code Ann. §16-60-112(b), this Court has subject matter jurisdiction and venue is proper herein.

### FACTUAL BACKGROUND

6.      Plaintiffs bring this action for the injuries and damages they suffered as a result of an injury that occurred on or about May 23, 2017 in White County, Arkansas.

7.      Plaintiff John Badger was contracted by Citation Logistics on or about May 22, 2017, to transport three (3) large pipes from Milbar in Shreveport, Louisiana to Progressive in Searcy, White County, Arkansas; each pipe weighed approximately 10,000 pounds. At all material times hereto, Progressive and Milbar acted through authorized agents and/or employees.

8.      On or about May 23, 2017, Plaintiff John Badger arrived at Milbar's principal place of business in Shreveport, Louisiana, with pipe stakes chained to his trailer. Milbar instructed Plaintiff John Badger to remove the pipe stakes and chains from his truck stating that the pipes could not be otherwise loaded for transport because they contained large valves.

9.      After Plaintiff John Badger removed his pipe stakes and chains per Milbar's

instructions, Milbar controlled and loaded the pipes onto Plaintiff John Badger's truck and secured the load with hardwood blocking. Milbar was negligent in failing to provide proper dunnage or chocks to properly secure the pipes.

10.     Plaintiff John Badger immediately transported the pipes to Progressive's White County business location at Steve's Auto Body, which is located at 200 Eastline Road, Searcy, White County, Arkansas, 72143.

11.     Upon Plaintiff John Badger arriving at Steve's Auto Body in Searcy, White County, Arkansas on or about May 23, 2017, Progressive took control of the removal of the pipes and in all respects was responsible for the safety of personnel in the removal process. Mr. Badger was instructed by Progressive to remove the transport straps from the pipes. Progressive was responsible to secure and unload the pipes in a safe manner. When Plaintiff John Badger released the last transport strap as instructed by Progressive one of the 10,000 pound pipes rolled off of the delivery truck, bounced once, and hit Plaintiff John Badger resulting in severe injuries. Due to the extreme nature of his injuries, Mr. Badger was transported by ambulance to Baptist Hospital in Little Rock, Arkansas.

12.     Progressive was negligent in directing Plaintiff John Badger to remove his transportation straps before properly checking and ensuring the proper safety lines were applied and utilized during the unloading of the three (3) large pipes.

13.     At all times herein, Plaintiff John Badger operated in a reasonable and prudent manner, with caution and regard to all safety rules and regulations.

14.     At all relevant times and places described herein, Plaintiff John Badger exercised due care and was without negligence on his part.

15.     Progressive and Milbar jointly and severally caused severe temporary and

permanent injuries to Plaintiff John Badger requiring him to obtain major medical treatment and an extended leave of absence from work. The Defendants' conduct caused physical injuries including, but not limited to, a crushed leg and foot.

16.     Plaintiff John Badger has not been released from major medical care at the time of the filing of this Complaint; he is not completely healed to this day, continues to suffer from the after effects of his injuries, and will continue to suffer for the foreseeable future.

17.     Plaintiffs John Badger and Melissa Badger have suffered a loss of comfort, companionship, society, and affection as a result of Plaintiff John Badger's severe injuries.

18.     Plaintiffs John Badger and Melissa Badger have suffered a loss of the benefit of conjugal relations as a result of Plaintiff John Badger's severe injuries.

## <u>COUNT 1 – PROGRESSIVE'S NEGLIGENCE</u>

19.     Plaintiffs re-allege and restate paragraphs 1-18 hereinabove as set forth word for word.

20.     Defendant Progressive, in jointly and severally causing the above-described injuries, was negligent in the following respects, including but not limited, to:

    a.     failure to warn;

    b.     failure to control the pipes when unloading;

    c.     failure to have sufficient trained personnel to unload pipes;

    d.     failure to have proper equipment and supplies to unload pipe;

    e.     failure to ensure that proper unloading cables were attached to the load before the shipping straps were released;

    f.     failure to maintain proper safety protocols;

    g.     failure to act reasonably and exercise ordinary care for the safety of others during the unloading process; and

       h.      otherwise failing to obey the safety rules and regulations set out by OSHA and the U.S. Department of Transportation.

### COUNT 2 – MILBAR'S NEGLIGENCE

21.     Plaintiffs re-allege and restate paragraphs 1-20 hereinabove as set forth word for word.

22.     Defendant Milbar, in jointly and severally causing the above-described injuries,

was negligent in the following respects, including, but not limited to:

       a.      failure to properly load the pipes;

       b.      failure to use proper equipment and supplies to load the pipes;

       c.      failure to have sufficiently trained personnel load the pipes;

       d.      failure to maintain proper safety protocols;

       e.      failure to act reasonably and exercise ordinary care; and

       f.      failure to obey the safety rules and regulations set out by OSHA and the U.S. Department of Transportation.

### DAMAGES

23.     Plaintiffs re-allege and restate paragraphs 1-22 hereinabove as set forth word for word.

24.     As a direct and proximate cause of the negligence of the joint tortfeasors, Progressive and Milbar, Plaintiff John Badger has suffered the following damages, among others:

       a.      past and future conscious pain and suffering;

       b.      medical, nursing, and care-taking expenses related to the injuries in the past and reasonably certain to be experienced in the future;

       c.      past and future loss of earning, profits, salary, and working time;

       d.      temporary and permanent physical disability;

e.     past, present, and future mental anguish, emotional pain, and suffering;

f.     scars and disfigurement;

g.     disorientation of the family atmosphere and pain and emotional suffering because of same;

h.     loss of consortium, companionship, and services of Melissa Badger as the wife of John Badger; and

i.     all other damages available under Arkansas and Federal law, both statutory and those recognized at common law.

25.     As a direct and proximate cause of the negligence of the joint tortfeasors, Progressive and Milbar, Plaintiff Melissa Badger has suffered the loss of her husband, Plaintiff John Badger's services, society, companionship, and marital relationship, and should be awarded damages for loss of consortium.

26.     The damages sustained by the Plaintiffs were directly and proximately caused by the negligence and fault described herein by the Defendants.   Said damages are within the minimum or maximum jurisdictional limits of this Court and exceed the minimum jurisdictional limits of any other Court to which this cause may be transferred.   Plaintiffs' actual damages exceed $75,000.00.

27.     All of the damages listed above were a direct and proximate cause by the aforementioned negligence of Progressive and Milbar and were incurred without contributory negligence or assumption of the risk on the part of Plaintiff John Badger.

28.     Plaintiffs reserve the right to amend their Complaint, seeking leave of Court, if necessary, to assert further damages as discovery progresses, and if the operative facts warrant and/or support same.

## COUNT 3 – RECKLESS CONDUCT AND PUNITIVE DAMAGES

29.     Plaintiffs re-allege and restate paragraphs 1-28 hereinabove as set forth word for word.

30.     Defendants, Progressive and Milbar, knew that their conduct would naturally and probably result in injury and continued such conduct in reckless disregard of the consequences from which malice is inferred.

31.     As a result of the Defendants' reckless disregard and conscious indifferences for the safety of others, Plaintiffs sustained unnecessary severe injuries and damages and are entitled to recover punitive damages in an amount to be determined by the jury.

### DEMAND FOR JURY TRIAL

32.     Plaintiffs John Badger and Melissa Bader demand a trial by jury in this matter pursuant to the *Arkansas State Constitution*, Article 2, Section 7 and Rule 38 of the *Arkansas Rules of Civil Procedure*.

WHEREFORE, Plaintiffs John Badger and Melissa Badger, pray for judgment against the joint tortfeasors and Defendants, Progressive Pipeline Construction, LLC and Milbar Hydro-Test, Inc., in an amount which will reasonably and sufficiently compensate Plaintiffs for all injuries and damages sustained as a result of the injury in question in an amount left to the sound discretion of the jury, but in an amount in excess of the amount necessary to satisfy the jurisdictional limits of this Court, or any Court to which this matter may be transferred, for a trial by jury, reasonable attorney's fees and costs herein expended, pre-judgment interest and post-judgment interest as this Court deems appropriate, and for all other relief to which they is justifiably entitled.

Respectfully submitted,

**JOHN AND MELISSA BADGER**

Charles Darwin "Skip" Davidson, ABN 73026
Sydney L. Brown, ABN 2016033
**DAVIDSON LAW FIRM**
724 Garland, Cantrell at State
P.O. Box 1300
Little Rock, AR  72203
501.374.9977 │ Telephone
501.374.5917 │ Fax
Email: Skipd@dlf-ar.com
Email: Sydneyb@dlf-ar.com
**ATTORNEYS FOR PLAINTIFFS**